# EXHIBIT A

FILED
10-12-2023
Clerk of Circuit Court
La Crosse County WI
2023CV000481
Honorable Gloria L. Doyle
Branch 5

| STATE OF WISCONSIN | CIRCUIT COURT | LA CROSSE |
|---|---|---|

Dale Wetterling et al vs. City of La Crosse et al

**Electronic Filing Notice**

Case No. 2023CV000481
Class Code: Intentional Tort

CITY OF LA CROSSE
400 LA CROSSE ST.
LA CROSSE WI 54601

Case number 2023CV000481 was electronically filed with/converted by the La Crosse County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party. This fee may be waived if you file a Petition for Waiver of Fees and Costs Affidavit of Indigency (CV-410A) and the court finds you are indigent under §814.29, Wisconsin Statutes.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 862d5b**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 608-785-9590.

La Crosse County Circuit Court
Date: October 13, 2023

GF-180(CCAP), 11/2020 Electronic Filing Notice

This form shall not be modified. It may be supplemented with additional material.

§801.18(5)(d), Wisconsin Statutes

FILED
10-12-2023
Clerk of Circuit Court
La Crosse County WI
2023CV000481
Honorable Gloria L. Doyle
Branch 5

STATE OF WISCONSIN     CIRCUIT COURT     LA CROSSE COUNTY

DALE WETTERLING and MARY WETTERLING,
2700 Del Ray Ave.
La Crosse, WI 54603,

and

RONALD MARTENS and JOY MARTENS,
2555 Bainbridge St.
La Crosse, WI 54603,

       Plaintiffs,

    vs.

CITY OF LA CROSSE, a municipal corporation,
400 La Crosse St.
La Crosse, WI 54601,

WISCONSIN MUNICIPAL MUTUAL
INSURANCE COMPANY,
4781 Hayes Road, Suite 201
Madison, WI 53704,

and

ABC INSURANCE COMPANY,

       Defendants.

**SUMMONS**

Case No. 23-CV-____

Case Codes: 30106, 30704

---

THE STATE OF WISCONSIN, to each person named above as a defendant:

You are hereby notified that the plaintiffs named above have filed a lawsuit or other legal action against you.  The Complaint, which is attached, states the nature and basis of the legal action.

Within 45 days of receiving this Summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint.  The Court may reject or disregard an Answer that does not follow the requirements of the statutes.  The Answer

1

must be sent or delivered to the Court whose address is Clerk of Circuit Court, La Crosse County Courthouse, 333 Vine Street, La Crosse, WI 54601, and to FITZPATRICK, SKEMP & BUTLER, LLC, plaintiffs' attorneys whose address is 1123 Riders Club Road, Onalaska, WI 54650. You may have an attorney help or represent you.

If you do not provide a proper Answer within 45 days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future and may be enforced by garnishment or seizure of property.

**FITZPATRICK, SKEMP & BUTLER, LLC**
**Attorneys for Plaintiffs and Class Members**

Dated: October 12, 2023.

*Electronically signed by Timothy S. Jacobson*
Timothy S. Jacobson, WI Bar No. 1018162
1123 Riders Club Rd
Onalaska, WI 54650
608.784.4370
tim@fitzpatrickskemp.com

**SINGLETON SCHREIBER, LLC**
**Attorneys for Plaintiffs and Class Members**

Dated: October 12, 2023.

*Electronically signed by Kevin S. Hannon*
Kevin S. Hannon, WI Bar No. 1034348
Joseph A. Welsh (*Pending Pro Hac Vice*)
1641 Downing Street
Denver, CO 80218
720.704.6028
khannon@singletonschreiber.com

Paul Starita (*Pending Pro Hac Vice*)
SINGLETON SCHREIBER, LLC
591 Camino de la Reina #1025
San Diego, CA 92108
720.704.6028
pstarita@singletonschreiber.com

2

FILED
10-12-2023
Clerk of Circuit Court
La Crosse County WI
2023CV000481
Honorable Gloria L. Doyle
Branch 5

STATE OF WISCONSIN     CIRCUIT COURT     LA CROSSE COUNTY

DALE WETTERLING and MARY WETTERLING,
2700 Del Ray Ave.
La Crosse, WI 54603,

and

RONALD MARTENS and JOY MARTENS,
2555 Bainbridge St.
La Crosse, WI 54603,

        Plaintiffs,

    vs.

CITY OF LA CROSSE, a municipal corporation,
400 La Crosse St.
La Crosse, WI 54601,

WISCONSIN MUNICIPAL MUTUAL
INSURANCE COMPANY,
4781 Hayes Road, Suite 201
Madison, WI 53704,

and

ABC INSURANCE COMPANY,

        Defendants.

**COMPLAINT**

Case No. 23-CV-___

Case Codes: 30106, 30704

---

## SUMMARY OF CLAIMS

1.    Plaintiffs, Dale Wetterling and Mary Wetterling, and Ronald Martens and Joy

Martens, by their attorneys, Fitzpatrick, Skemp & Butler, LLC and Singleton Schreiber, LLP,

file this action against the Defendants, City of La Crosse ("City") and Wisconsin Municipal

Mutual Insurance Company ("Wisconsin Municipal"), and allege as follows:

2.      Plaintiffs and Class Members are residents or former residents of the Town of Campbell, Wisconsin (hereinafter the "Town"). The aquifer which supplies water to Plaintiffs' and Class Members' private household wells within the Town has been contaminated by the presence of chemicals used by the City.

3.      Plaintiffs and Class Members bring this class action against Defendants for injuries suffered by persons who at relevant time occupied residential real property in the Class Geographic Area (hereinafter the "Class Area"), and were injured due to significant exposure to per- and polyfluoroalkyl substances (hereinafter "PFAS") contained in aqueous film forming foam (hereinafter "AFFF"), a fire suppressant used by the City.

4.      For decades the City used AFFF, and/or its toxic PFAS components, a firefighting suppressant, at and in the vicinity of the La Crosse Regional Airport (hereinafter "LSE"), in La Crosse, Wisconsin, including using AFFF within, and outside, City boundaries, including directly on one or more properties within the Town. LSE is situated directly adjacent to the Town surrounding its boundaries to the west and south, with the Black River to its east.

5.      Over the course of five decades, releases of AFFF containing toxic PFAS components from LSE migrated into groundwater and private household wells in the Class Area. Without knowledge of this toxic PFAS contamination, Plaintiffs and Class Members have been exposed to and ingested toxic PFAS components from AFFF used by the City and released at and around LSE by the City.

6.      Residents in the Class Area have obtained their drinking water from groundwater pumped by private wells. For decades, Plaintiffs' and Class Members' household water has been contaminated by toxic PFAS components of AFFF, which include perfluorooctane sulfonate (hereinafter "PFOS"), perfluorooctanoic acid (hereinafter "PFOA"), perfluoroheptanoic acid

2

(hereinafter PFHpA), and other species of PFAS. Plaintiffs' and Class Members' exposure to and consumption of known toxic PFAS components from AFFF has increased, and continues to increase, the likelihood they will develop an illness, disease, or disease process that they otherwise would not without such significant exposure.

7.      PFAS are known hazardous chemicals and substances. When PFAS from AFFF are ingested and absorbed into a person's bloodstream and tissue, they bioaccumulate, biomagnify, and remain in their bodies for years. As a result, consumption of toxic PFAS components from AFFF are known to alter the structure of persons' bodies and cause an increased risk of illness, disease, and disease process, including but not limited to thyroid disease, testicular cancer, and kidney cancer.

8.      As a result of the City's releases of AFFF, and its toxic PFAS components, throughout the Class Area, in 2021 Wisconsin Department of Health Services (hereinafter "WDHS") advised residents in the Class Area not to use or drink their water due to the PFAS contamination.

9.      The risks of illness, disease, and disease process from significant exposure to toxic PFAS components from AFFF has plagued, and will continue to plague, Plaintiffs and Class Members. As a result, Plaintiffs and Class Members have been injured by the acts and/or omissions of the City that caused toxic PFAS components in AFFF to contaminate household water supplies throughout the Class Area which they then used and consumed water.

10.     The City used AFFF and/or its toxic PFAS components, including fluorochemical surfactants, PFOS, PFOA, and/or certain other PFAS that degrade into PFOS or PFOA. The City knew or should have known significantly prior to the City's public disclosure of PFAS contamination on French Island that the use of AFFF on French Island presented an unreasonable

3

risk to human health and the environment. The City also knew or should have known that toxic

PFAS components are highly soluble in water, and highly mobile and persistent in the

environment, and highly likely to contaminate residential real property water supplies and soil if

released to the environment.

11.     Nonetheless, the City used AFFF products with knowledge that large quantities of

AFFF, and its toxic PFAS components, would be used in fire training exercises and in

emergency situations at LSE in such a manner that toxic PFAS components would be released

into the environment. The City knew or should have known that even when used as intended by

the products' design, discharge of toxic PFAS components into the environment would cause

environmental and health hazards.

12.     Plaintiffs and Class Members have been contaminated for years, if not decades,

by toxic PFAS components including at concentrations hazardous to human health.

13.     For decades, La Crosse and LSE routinely used AFFF products in fire training

exercises, fire suppression, in annual testing, and for other purposes and, on one or more

occasions, accidentally spilled AFFF. As a result, toxic PFAS components used in AFFF

migrated into the groundwater surrounding LSE, contaminating private wells used to provide

household water to properties in the Class Area.

14.     Sampling and testing in the Class Area have detected PFAS at levels hazardous to

human health.

15.     Plaintiffs and Class Members ingested PFAS contaminated water because of

Defendants' tortious conduct in using and spilling AFFF. Plaintiffs and Class Members absorbed

PFAS-contaminated water into their body tissue and bloodstream, altering their bodies'

biochemical processes, structure, and/or function in a way that leads to latent illness, disease, or disease process.

16.     Plaintiffs' and Class Members' significant exposure to toxic PFAS components in AFFF have caused them bodily harm in the form of detrimental alteration of the structure and/or function of their bodies, and therefore past, present, and future injury.

17.     As a result of Plaintiffs' and Class Members' significant exposure to PFAS from AFFF, they have suffered past, present, and future increased risk of PFAS related illness, disease, and disease processes. PFAS related illness, disease, and disease processes are often latent or misidentified, making specialized diagnostic testing for early detection of PFAS related illness, disease, or disease processes medically reasonably necessary and beneficial. Because of Plaintiffs' and Class Members' significant exposure to toxic PFAS components from AFFF they have incurred the pecuniary loss and injury of the costs associated with such medically necessary diagnostic testing and medical tests.

18.     As a result of the contamination, Plaintiffs and Class Members presently require and, in the future will require, diagnostic testing to ensure early detection of illness, disease, and disease process caused by exposure to toxic PFAS components in AFFF. It is well-known that many of the serious illness, disease, and disease process caused by toxic PFAS exposure can be asymptomatic in the patient prior to the manifestation of significant and sometimes fatal illness or disease.

19.     Toxic PFAS components contained in AFFF have created an increased risk of illness, disease, and disease processes for Plaintiffs and Class Members using private groundwater wells within the Class Area.

5

20.     It is beneficial to Plaintiffs and Class Members to know of any latent illness, disease, and disease processes from their exposure to PFAS contaminated water because of use of AFFF at and around LSE. Therefore, Plaintiffs' and Class Members' injuries make it reasonably necessary that Plaintiffs and Class Members incur the costs of present and future medical monitoring. Notice and diagnostic plans described herein will equip Plaintiffs, Class Members, and their doctors with the requisite knowledge to take appropriate steps to protect themselves from latent illness, disease, and disease process.

21.     Defendants' tortious conduct constitutes an invasion of Plaintiffs' and Class Members' legally protected interests in the form of past, present, and future increased risk of illness, disease, and disease process from their significant exposure to toxic PFAS components from AFFF.

22.     The City's tortious conduct constitutes an invasion of Plaintiffs' and Class Members' legally protected interests in the form of past, present, and future injury of pecuniary loss of the cost of medically necessary diagnostic testing for the early detection of illness, disease, and disease process caused by their significant exposure to toxic PFAS components from AFFF and their consequent increased risk of illness, disease, and disease process.

23.     The Plaintiffs and Class Members bring this suit on behalf of themselves and all those similarly situated to recover costs of medical monitoring for the early detection of illness, disease, and disease process caused by the PFAS water contamination crisis in the Town and Plaintiffs' and Class Members' private household wells caused by the tthe City's tortious conduct.

6

## PARTIES

24.     Plaintiffs are individuals, all of whom, at all relevant times to this action, owned, occupied, and/or used private drinking wells within the Class Area, and were exposed to and ingested toxic PFAS components for at least one year over the past five decades of the City's use of AFFF.

25.     Plaintiffs, Dale Wetterling and Mary Wetterling, at all relevant times to this action, were and are adult residents of the Town who own residential real property within the Class Area in the County of La Crosse, Wisconsin, and at all times relevant hereto have been husband and wife and joint owners and occupiers of that property and home located thereon at 2700 Del Ray Ave., La Crosse, Wisconsin.

26.     Plaintiffs, Ronald Martens and Joy Martens, at all relevant times to this action, were and are adult residents of the Town who own residential real property within the Class Area in the County of La Crosse, Wisconsin, and at all times relevant hereto have been husband and wife and joint owners and occupiers of that property and home located thereon at 2555 Bainbridge St., La Crosse, Wisconsin.

27.     Plaintiffs and their fellow Class Members all individually served Notices of Circumstances of Claim and Itemized Claims on the City pursuant to §893.80(1d) (a) and (b), Stats., and their claims have been denied by the City.

28.     Upon information and belief, the City of La Crosse ("City") is a municipal corporation with its principal place of business at 400 La Crosse Street, in the City and County of La Crosse, Wisconsin.

29.     The City owns and operates the La Crosse Regional Airport (the "Airport"), a public airport located in the City of La Crosse, La Crosse County, Wisconsin, which occupies a

7

northern area of French Island, next to the Mississippi and Black Rivers and adjacent to hundreds

of private residences, as well as private businesses and nonprofit organizations, the majority of

which are serviced by private drinking water wells.

30.    The City also operates the La Crosse Fire Department which responds to calls for

fire suppression and conducts fire response training for its firefighters.

31.    Upon information and belief, the Defendant, Wisconsin Municipal Mutual

Insurance Company ("Wisconsin Municipal"), is a domestic insurance corporation with offices

located at 4781 Hayes Road, Suite 201, Madison, WI 53704, and is engaged in and is authorized

to conduct the business of selling and administering policies of liability insurance in the State of

Wisconsin.

32.    Upon information and belief, on a date prior to the events and injuries hereinafter

alleged, the Defendant, Wisconsin Municipal, issued and delivered to the Defendant, the City, its

policies of liability and/or excess and/or umbrella insurance under and by virtue of the terms of

which it agreed to pay on behalf of the City any and all sums which the City should become

legally obligated to pay by reason of liability imposed upon it arising out of its tortious actions.

33.    By virtue of the terms and conditions of said City's insurance policies and the

statutes of the State of Wisconsin, the Defendant Wisconsin Municipal is directly liable to the

Plaintiffs and Class Members for any injuries or damages sustained by them as hereinafter

alleged.

34.    Upon information and belief, the Defendant, ABC Insurance Company, is a

corporation doing business in the State of Wisconsin, and the Defendant ABC Insurance

Company is a fictitious name for the actual Defendant whose name is unknown to the Plaintiffs

8

but is made a party to this action pursuant to §807.12, Stats., and by virtue of having provided liability insurance to the City at all times relevant hereto.

35.     Upon information and belief, on a date prior to the events and injuries hereinafter alleged, the Defendant, ABC Insurance Company issued and delivered to the Defendant City of La Crosse its policy of liability insurance under and by virtue of the terms of which it agreed to pay on behalf of the City any and all sums which the City should become legally obligated to pay by reason of liability imposed upon it arising out of its tortious actions.

36.     By virtue of the terms and conditions of said City's insurance policy and the statutes of the State of Wisconsin, the Defendant ABC Insurance Company is directly liable to the Plaintiffs and Class Members for any injuries or damages sustained by them as hereinafter alleged.

### GENERAL ALLEGATIONS

37.     PFAS are manmade chemicals that do not exist in nature. The City used toxic AFFF and/or its PFAS components at, and in the vicinity of, LSE.

38.     PFAS are persistent in the environment. Due to the strength of multiple carbon-fluorine bonds, PFAS break down slowly in the environment, are chemically biologically stable, resistant to environmental degradation, and can persist in the environment for decades. PFAS are also water soluble, making them mobile in groundwater and the environment.

39.     Toxicology studies show that PFAS are readily absorbed after oral exposure and accumulate in the human body.

40.     There are numerous health risks associated with exposure to PFAS. For example, PFOS and PFOA exposure is associated with increased risk in humans of testicular cancer and kidney cancer, disorders such as thyroid disease, high cholesterol, ulcerative colitis, and

pregnancy-induced hypertension, as well as other conditions.[1] The EPA has also advised that exposure to PFAS may result in developmental effects to fetuses during pregnancy or to breast-fed infants.[2]

41.     AFFF, and its toxic PFAS components, released at LSE migrated, and are migrating, from areas of release at or around LSE to the wells throughout the Town and have entered and contaminated Plaintiffs' and Class Members' real property, water rights, wells and water systems, including household piping.

42.     AFFF use for fire suppression and other activities at LSE dates from the 1970s through at least 2020. Storage of AFFF persists at LSE.

43.     Toxic PFAS components from AFFF released at LSE have migrated, and continue to migrate, to areas of release on LSE to wells throughout the Class Area and have entered and contaminated Plaintiffs' and Class Members' real property, water rights, wells and water systems, including household piping.

44.     Groundwater and surface water released from, and in connection with, LSE flows to the wells throughout the Class Area.

45.     Plaintiffs and Class Members resided in residential real properties with private wells within the Class Area.

46.     Concentrations of toxic PFAS components found in the private wells serving Plaintiffs' and Class Members' water supplies have been caused by releases of AFFF, and its toxic components, on and around LSE property.  As was reasonably foreseeable by the City, AFFF containing toxic PFAS components was discharged onto open ground and surface waters during

---

[1]ww.epa.gov/sites/production/files/201605/documents/drinkingwaterhealthadvisories_pfoa_pfos_5 _19_16.final_.1.pdf
[2] *Id.*

fire training, fire suppression, and other exercises. As was reasonably foreseeable by the City, AFFF, and its toxic PFAS components, migrated into and through the soil in and around LSE to the groundwater under LSE. From there, AFFF, and its toxic PFAS components, migrated to Plaintiffs' and Class Members' private groundwater wells in the Class Area. The Class Area's PFAS contamination is directly and proximately linked to the City's use of AFFF.

47.     Because of the City's tortious conduct in use of AFFF containing toxic PFAS components and the City's failure to warn Plaintiffs and Class Members of groundwater contamination with PFAS, Plaintiffs and Class Members have been forced to cease use of their private household wells because PFAS have contaminated their water supply.

48.     Plaintiffs and Class Members took, and continue to take, delivery of a substitute water supply out of necessity to avoid consumption of PFAS contaminated water caused by AFFF.

49.     Thus, the City, through use of AFFF, and its toxic PFAS components; by its tortious conduct proximately caused Plaintiffs' and Class Members' injuries by contaminating the groundwater.

**PFAS ARE USED IN AQUEOUS FILM FORMING FOAM**

50.     PFAS are synthetic carbon chain compounds that are not naturally occurring and contain large amounts of the element fluorine. As used in this Complaint, the term "PFAS" includes all PFAS and their precursors, derivatives, and/or salts used in the AFFF released at LSE which contaminated Plaintiffs' and Class Members' water supplies and property, including inter alia, PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, PFDA, PFDS, PFUnA, PFDoA, and PFTrA.

11

51.     PFAS are used in firefighting foam known as "aqueous film forming foam" ("AFFF").

52.     AFFF is used to extinguish fires that involve petroleum or other flammable liquid because PFAS are resistant to heat, oil, grease, and water.

53.     3M AFFF is produced through a 3M process called electrochemical fluorination, or ECF, contained PFAS including PFOS. Tyco and other manufacturers' AFFF are synthesized through telomerization and contain PFAS including PFOA. Both processes include formulations containing chemicals that can break down into other toxic PFAS components.

54.     The City chose to use toxic AFFF despite the availability of other technologically feasible, practical, and effective alternatives that would have reduced or mitigated Plaintiffs' and Class Members' exposure to toxic PFAS.

55.     The City knew or should have known that the AFFF, and its toxic PFAS components, would be released into the environment and contaminate groundwater and household water supplied, including Plaintiffs' and Class Members' household water supplies.

56.     The City knew or should have known that harmful and defective products, AFFF containing toxic PFAS components, would be used for various purposes at LSE including, but not limited to, training for firefighting, testing firefighting equipment, actual firefighting, and use in hangar sprinkler fire suppressant systems, which would cause the AFFF to drain into the ground and pollute or contaminate the groundwater beneath the airport and eventually migrate into Plaintiffs' and Class Members' household water supplies.

**PFAS Including PFOA and PFOS Threaten Human Health**

57.     PFAS are extremely persistent and bioaccumulate[3] in the human body. Even

---

[3] Bioaccumulation is a process which occurs when an organism absorbs a substance at a rate

short-term exposure results in a body burden that persists for years and can increase and

biomagnify[4] with continued exposure. When consumed PFAS accumulate primarily in the

bloodstream, kidneys, and liver. Humans absorb toxic PFAS components from AFFF when they

consume AFFF contaminated household water.

58.     The EPA projects that PFOS has a half-life of 5.3 years, PFOA has a half-life of

2.3-3.8 years, and PFHxS has a half-life of 8.5 years, in humans.[5] Because of these extended

half-lives, the EPA expects that "it can reasonably be anticipated that continued exposure could

increase body burden to level that would result in adverse outcomes."[6]

59.     EPA Health Advisories have identified numerous health risks associated with

exposure to toxic PFAS components. Studies show association between increased PFOA and

PFOS levels in blood and increased risk of several adverse health effects, including high

cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-

eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and

testicular cancer.

60.     The EPA classified PFOA and PFOS as having suggestive evidence of

carcinogenic potential in humans.[7]

61.     The EPA cited reports from the Organization for Economic Co-operation and

Development (*hereinafter* "OECD") in the May 2016 Health Advisories. The OECD is an

---

faster than the rate at which the substance is lost by metabolism or excretion.
[4] Biomagnification is a process which occurs when concentration of a substance in organism's tissue increases as the substance travels up the food chain.
[5] A half-life is the amount of time it takes for fifty percent of a contaminant to leave the body.
[6] EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, pp. 1, 8-9, December 30, 2009.
[7] EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 3-159, May 2016; EPA, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS), p. 3-114, May 2016.

international intergovernmental organization that meets, discusses issues of concern, and works to respond to international problems.

62.     According to a published OECD Report, for mammalian species, PFOA and its salts have caused cancer in rats and adverse effects on the immune system in mice. In addition, PFOA and its salts can display reproductive or developmental toxicity in rodents at moderate levels of exposure, and moderate to high systemic toxicity in rodents and monkeys following long-term exposure by the oral route.[8] The OECD also concluded in a Hazard Assessment that PFOS is persistent, bioaccumulative, and toxic to mammalian species.[9]

63.     The EPA also cited findings from a C-8 Science Panel and Health Project in the May 2016 Health Advisory for PFOA. The C-8 Science Panel was formed out of a class action settlement related to PFOA contamination of groundwater from a manufacturing facility in West Virginia. The C-8 Health Project is the largest study evaluating human exposure and health endpoints for PFOA; the study included more than 65,000 people in Mid-Ohio Valley communities who were exposed to PFOA for longer than 1 year. The C-8 Science Panel consisted of three epidemiologists and its goal was to assess the links between PFOA and numerous diseases. The C-8 Science Panel carried out studies of exposure and health studies between 2005 and 2013; information was gathered through questionnaires and blood samples from the individuals who had PFOA contaminated drinking water and previously published studies.

64.     The C-8 Science Panel released reports which found probable links between exposure to PFOA and six diseases: high cholesterol, ulcerative colitis, thyroid disease, testicular

---

[8] OECD, Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007.
[9] OECD, Hazard Assessment of Perfluorooctane Sulfonate (PFOS) and Its Salts, p. 5, November 21, 2002.

cancer, kidney cancer, and pregnancy-induced hypertension.

65.     The U.S. Agency for Toxic Substances and Disease Registry (*hereinafter* "ATSDR") stated in its 2018 draft Toxicological Profile that studies suggest associations between PFOA and PFOS exposure and liver damage, pregnancy-induced hypertension, increased cholesterol, increased risk of thyroid disease, increased risk of asthma, increased risk of decreased fertility, low birth weight, and increases in testicular and kidney cancers.

66.     In February 2018, WDNR stated that PFAS compounds meet the definition of hazardous and/or environmental pollution under Wis. Stat. §292.01. Three years later, prevalence of PFAS contamination in the Class Area led WDHS to declare an emergency water advisory for the area.

67.     The City knew or reasonably should have known about the environmental and health effects from toxic PFAS components, discussed above, at times they used AFFF containing toxic PFAS components at and around LSE.

### PFAS, Including PFOA and PFOS, Pose a Threat to the Private Household Wells Relied on by Plaintiffs and Class Members

68.     PFAS are extremely persistent in the environment because they are chemically and biologically stable and are resistant to environmental degradation. The EPA projects that PFOS has an environmental half-life in water of over 41 years, and PFOA has an environmental half-life in water of over 92 years. PFOA and PFOS are also considered to be resistant to degradation in soil. EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, p. 1, December 30, 2009.

69.     PFAS also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

70.     Additionally, non-human receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, and humans, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species. PFOS is linked to developmental, reproductive, and systemic toxicity.

71.     PFOA is also readily absorbed by plants, including wild plants as well as crops grown on contaminated soil and bioaccumulates in the food chain.

72.     These effects impair use of Plaintiffs' and Class Members' household water and other property throughout the Class Area.

73.     Upon information and belief, the City knew or should reasonably have known about the environmental effects from toxic PFAS components, discussed above, at times it used AFFF, and its toxic PFAS components.

**The City's Use, Storage, Release, Discharge, and Disposal of PFAS from AFFF at and around LSE Has Contaminated Plaintiffs' and Class Members' Household Water**

74.     Upon information and belief, La Crosse began purchasing and using AFFF containing toxic PFAS components at LSE in about 1970.

75.     Over the following fifty years LSE discharged and disposed of AFFF containing toxic PFAS components in and around the airport. LSE's discharge and disposal of AFFF, and its toxic PFAS components, has included, but is not limited to, releases and discharges into soil and water pathways that connect to property, groundwater, household water supplies, household water systems within the Class Area. Such AFFF discharges containing toxic PFAS components have resulted in infiltration of soil and migrated into groundwater and water supply throughout the Class Area.

16

76.     For instance, testing, training, exercises, and fire response activities occurred on and around LSE, causing AFFF waste containing toxic PFAS components to drain into soil, groundwater, surface waters, wetlands, ponds, and ditches. Toxic PFAS components, discharged to soil, surface waters, wetlands, and ponds have migrated into groundwater and contaminated the groundwater throughout the Class Area where Plaintiffs and Class Members wells are located, contaminating Plaintiffs' and Class Members' property and water supply.

77.     As of January 12, 2021, La Crosse reported to the public that it had completed PFAS testing of well water samples from 109 private wells, with 108 of said wells testing positive for PFAS.

78.     Months later, proof of French Island's pervasive contamination was reinforced. As of June 2021, 538 private wells on French Island tested positive for PFAS contamination.

79.     The widespread contamination led WDHS to declare an emergency water advisory for the area in March 2021. Levels of PFOA and PFOS in household water wells on French Island had, at that time, been detected and reported at concentrations as high as 3,200 ppt.

**Specific Release, Discharge, Disposal, and Storage of PFAS-Based AFFF at LSE**

80.     Studies have preliminarily identified groundwater, surface water, and soil pathways where toxic PFAS components in AFFF used on and around LSE has been, and is, migrating to the Plaintiffs' and Class Members' groundwater and household water wells.

81.     Initial Site Investigation Work Plan submitted by La Crosse to WDNR identified five potential source areas of PFAS contamination on French Island originating on LSE property: (1) Former Test Burn Pits: (2) a 1997 Fuel Spill, where AFFF was applied over the spilled jet fuel; (3) AFFF Test Area, where AFFF was discharged while annually collecting FAA-required sampled from firefighting equipment; (4) Former Fire Station, where AFFF was stored and

17

transferred into firefighting equipment; and (5) 2001 Crash site, where AFFF was applied to wreckage. While these were the preliminarily identified sites, subsequent information indicates additional releases and discharges of AFFF occurred in LSE operations.

82.     Upon information and belief, the City began using AFFF in the 1970s. Shortly thereafter, La Crosse and/or LSE created test burn pits in an area northwest of what is presently designated runway 22, east of runway 18, and north of runway 31. Firefighting training using AFFF was conducted at test burn pits at the airport from the 1970s through approximately 1988.

83.     In or about January 1997, a jet fuel spill occurred near an LSE terminal, and LSE firefighters applied AFFF to the spilled jet fuel.

84.     Over an approximately twenty-year period La Crosse and/or LSE conducted nozzle testing using AFFF in a test area northwest of the LSE fire station.

85.     For years, AFFF was stored in the former LSE fire station, where firefighters transported AFFF from the fire station into their equipment.

86.     In June 2001, a jet aircraft crash at LSE resulted in a fire. Upon information and belief, the Airport Fire Department owned and operated by La Crosse responded to the crash and sprayed AFFF at the crash site.

87.     An April 2021 Interim Site Investigation Report revised the above list to include a December 1, 2020, event when an AFFF solution was released from emergency response equipment by LSE personnel on or around a terminal apron.

88.     The Interim Site Investigation listed the above "confirmed sources" along with several "potential sources." Including:

(a) Practice burn activities near Fisherman Road (just outside the airport) reported by citizens during the 1970s.

(b) An aircraft crash on or about November 9, 1970, at 609 Dakota Street, northwest of the airport, across Lakeshore Drive. A La Crosse Tribune article, dated 11/10/1970, states, "Kenneth Kearns, La Crosse assistant fire chief, said two engines, a foam truck, a water wagon and a rescue unit answered the call." Additionally, the article states, "Dried foam covered plane wreckage like a snowy mist. Kearns said firemen didn't notice any flames, but put the foam on as a precautionary measure." A photo caption accompanying the article states, "Foam Sprayed on Wreckage By La Crosse Fire Department To Prevent Fire" and depicts firefighting foam on the wreckage and on the ground.

(c) A de-icing truck caught fire on January 3, 2014, at the terminal apron and airport fire responders and LCFD responded to the fire. Extinguishing agents used were described as "75 gallons of AFFF used and about 700 gallons of water" in the "ARFF [Aircraft Rescue and Fire Fighting] Run Report."

89.    The City used AFFF, and its toxic PFAS components, for approximately fifty years. Throughout that period, the toxic PFAs components contained in AFFF have been released into the environment in significant quantities and migrated into household water supplies throughout the Class Area. As a result, Plaintiffs' and Class Members' water supplies have been contaminated by toxic PFAS.

90.    State and Local entities have not yet analyzed the extent of PFAS contamination at numerous other locations where AFFF was used and escaped into the environment, including, but not limited to, neighborhoods along the surface and groundwater pathways from LSE to the Town, including the Class Area.

**City Knew of PFAS Groundwater Contamination on French Island and AFFF Toxicity
but Failed to Provide Notice**

91.     A 1997 MSDS for a non-AFFF product made by 3M listed its ingredients as
water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a
chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly
by 3M and DuPont" as support for this statement.

92.     Under pressure from the EPA, on May 16, 2000, 3M announced it would phase
out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than
fifty years earlier. 3M press release, "3M Phasing Out Some of Its Specialty Materials", May 16,
2000.

93.     3M, the predominant manufacturer of AFFF, ceased production of PFOS based
AFFF in 2002.

94.     An EPA memo on the day of 3M's phase-out announcement stated: "3M data
supplied to EPA indicated that these chemicals are very persistent in the environment, have a
strong tendency to accumulate in human and animal tissues and could potentially pose a risk to
human health and the environment over the long term. [PFOS] appears to combine Persistence,
Bioaccumulation, and Toxicity properties to an extraordinary degree." EPA memo, "Phaseout of
PFOS," May 16, 2000.

95.     Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to
participate in the U.S. Environmental Protection Agency's PFOA Stewardship Program. The
participating companies made voluntary commitments to reduce product content and facility
emissions of PFOA and related chemicals by 95%, no later than 2010.

96.     Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

97.     The C8 panel consisted of three independent epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, thyroid cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

98.     The La Crosse Water Utility (LCWU) was a participant in US Environmental Protection Agency's third round of its Unregulated Contaminant Monitoring Rule (UCMR3) program. US EPA published in 2012 the list of unregulated contaminants to be sampled by selected water utilities throughout the country. La Crosse was included in this list of utilities. UCMR3 included sampling and testing for Perflourinated Alkyl Acids (PFAS). Perfluorooctanesulfonic acid (PFOS) and perfluorooctanoic acid (PFOA) were detected above recommended levels in the UCMR3 water samples collected for La Crosse Well 23H during 2014 and 2016.

99.     In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe nonfluorinated alternatives to these products to avoid long-term harm to human health and the environment.

100.    The USEPA's Lifetime Health Advisory and Health Effects of 70 ppt set in May

2016 was an attempt to identify the concentration of PFOA or PFOS in drinking water at or

below which health effects are not anticipated to occur over a lifetime of exposure.

101.    Many states have regulatory limits. For example, Vermont has set a combined

level of 20 ppt for PFOA and PFOS, and New Jersey set a maximum contaminant level (MCL)

of 13 ppt for PFOS and 14 ppt for PFOA. In April 2019, the State of Minnesota adopted advisory

drinking water limits of 15 ppt for PFOS and 27 ppt for PFOA. The State of California adopted

drinking water limits of 40 ppt for PFOS and 10 ppt for PFOA in February 2020. In July 2020,

New York adopted a limit of 10 ppt for both chemicals. In August 2020, Michigan adopted limits

of 16 ppt for PFOS and 8 ppt for PFOA.

102.    The Agency for Toxic Substances and Disease Registry ("ATSDR") proposed

minimum risk levels (MRLs) translating to 7 ppt for PFOS and 11 ppt for PFOA.

103.    The United States Senate and House of Representatives passed the National

Defense Authorization Act in November 2017, which included $42 Million to remediate PFAS

contamination from military bases, as well as devoting $7 Million toward the Investing in

Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct

a study into the long-term health effects of PFOA and PFOS exposure.

104.    In February 2018, the Wisconsin Department of Natural Resources ("WDNR")

stated that PFAS compounds meet the definition of hazardous substance and/or environment

pollution under Wis. Stat. §292.01. Therefore, persons responsible for the discharge of PFAS to

waters of the State of Wisconsin were required to immediately notify the state, conduct a site

investigation, determine the appropriate clean-up standards and perform the necessary response

actions. Wis. Admin. Code chaps. NR 700-754. The non-industrial direct contact soil residual

22

contaminant levels (RCLs) for both PFOA and PFOS is 1.26 mg/kg. The industrial direct contact RCL for both PFOA and PFOS is 16.4 mg/kg.

105.    USEPA made a Preliminary Determination that PFAS, specifically PFOA and PFOS, meet the statutory criteria to regulate under section 1412(b)(1)(A) of the Safe Drinking Water Act (SDWA); namely, (1) the chemicals "may have an adverse effect on the health of persons," (2) the chemicals are "known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern," and (3) regulating these chemicals "presents a meaningful opportunity for health risk reduction for persons served by public water systems."

106.    On April 18, 2019, the Remediation and Redevelopment program of the Wisconsin Department of Natural Resources (WDNR) was made aware that Polyfluoroalkyl Substances (PFAS) had been routinely detected in municipal well 23, located on the east side of French Island. WDNR determined that contamination on or from the above-described site poses a threat to public health, safety, welfare or the environment.

107.    WDNR determined, by letter dated May 10, 2019 to the City, that as owner of the property where the residual contamination is found, and the entity that caused the discharge of the hazardous substance, the City is responsible for restoring the environment at the above-described site under s. 292.11, Wis. Stats., known as the hazardous substances spills law.

108.    In August 2019, the Wisconsin Governor signed Executive Order No. 40, which directed the WDNR to take additional steps to address PFAS in coordination with the state's Department of Health Services and the Department of Agriculture, Trade and Consumer Protection. These steps include establishing a PFAS Coordinating Council and providing public information sites to inform the public on the matter of PFAS and the risk these chemicals pose to

23

public health and Wisconsin's natural resources. In February 2022, the Wisconsin Natural Resources Board approved a drinking water standard of 70 ppt for PFOA and PFOS individually and combined.

109.     The Wisconsin Department of Health Services (Wisconsin DHS) developed recommended health-based groundwater standards for PFOA and PFOS in 2019. Wisconsin DHS determined that a groundwater standard of a combined concentration of 20 ppt was necessary to protect the health of sensitive populations and to account for immunotoxicity effects. Wisconsin DHS based this recommendation on modeling and studies published after the 2016 HESDs. In January 2020, Wisconsin's Department of Natural Resources was authorized to proceed with establishing environmental standards for PFOA and PFOS in groundwater, surface water, and public drinking water. WDNR has recommended a PFOS and PFOA enforcement standard (ES) of 20 parts per trillion (ppt) and a preventive action limit (PAL) of 2 ppt.

110.     On or about May 14, 2020, while residents of French Island, including the Plaintiffs and Class Members, continued to unknowingly consume drinking water contaminated with PFAS, the City requested from WDNR a relaxation of the schedule for the site investigation being conducted under the requirements of the hazardous substances spills law, §292.11, Stats, and the NR 700 series of administrative code.

111.     As of September 1, 2020, per 2019 Wisconsin Act 101 and Wis. Stat. §299.48, training with AFFF was prohibited in Wisconsin, and testing of AFFF requires the facility to use appropriate treatment, containment, storage and disposal measures to prevent the discharge of foam to the environment.

112.     Despite these numerous public warnings about the ability of PFAS to migrate through groundwater and to cause human health issues, and despite the City being aware that

PFAS chemicals had migrated into City wells by at least 2014, the City failed, and continued to

fail for a period of years, to warn private well users in the Town, including Plaintiffs and Class

Members, that it was reasonably likely their wells were contaminated as a result of the City's

half-century of use of AFFF at and around LSE.

### The Threats to Plaintiffs', Class Members', and their Visitors' Health, Safety, and Property Caused by AFFF are Ongoing

113.    The PFAS contamination caused by AFFF is not contained and continues to

spread into Plaintiffs' and Class Members' property and household water supplies. As result,

Plaintiffs' and Class Members' have suffered the annoyance, inconvenience, and discomfort of

knowing that for years their health along with their family, friends, and visitors' health was

compromised by exposure to toxic PFAS components.

114.    If Plaintiffs' and Class Members' residential real property, water supplies, water

systems, wells, piping, soil, vegetation, and other property are not remediated, PFAS

contamination will continue to impact Plaintiffs' and Class Members' property and household

water far into the future because toxic PFAS components resist degradation and are persistent

and mobile in water and soil.

### Plaintiffs and Class Members Have Been Harmed by the City's Actions

115.    Because of the City's use of AFFF, and its toxic PFAS components, Plaintiffs and

Class Members private wells and properties have been and are being invaded and contaminated

by toxic PFAS components released on and in the vicinity of LSE.

116.    AFFF, and its toxic PFAS components, used by the City was released onto and in

the vicinity of LSE property. Thereafter toxic PFAS components in AFFF migrated into

surrounding groundwater and physically intruded onto, and contaminated, properties occupied by

Plaintiffs and Class Members, including residential real property, water supplies, water systems,

wells, piping, soil, vegetation, and other property in the Class Area. PFAS contamination of Plaintiffs' and Class Members' household water supplies, caused by AFFF, has further migrated through soils into groundwater, physically contaminating and interfering with Plaintiffs' and Class Members' right to use their household water supplies.

117.   It was reasonably foreseeable that releases of AFFF, and its toxic PFAS components, would migrate to properties occupied by Plaintiffs and Class Members in the Class Area and physically intrude onto, harm, and contaminate those properties including properties occupied by Plaintiffs and Class Members, water supplies, water systems, wells, piping, soil, vegetation, and other property owned and used by Plaintiffs and Class Members. Releases of AFFF, and its toxic PFAS components, has invaded and interfered with Plaintiffs' and Class Members' possessory interest in the use of their properties and household water supplies.

118.   Upon information and belief, the City knew or reasonably should have known of the aforementioned environmental and health risks associated with AFFF containing toxic PFAS components years prior to the first time Plaintiffs and Class Members were informed of PFAS contamination of groundwater on French Island.

119.   Widespread PFAS have since been detected in private wells throughout the Class Area used by the Plaintiffs and Class Members. The impact of this widespread contamination caused by the City's tortious conduct has had, and will continue to have, a detrimental impact on properties occupied by Plaintiffs and Class Members.

120.   In March 2021, five months after Plaintiffs and Class Members began to receive information about PFAS contamination, WDHS declared an emergency water advisory in the Class Area.

121.    Properties occupied by Plaintiffs and Class Members and water supplies have

been and are being exposed to PFAS introduced into their residential real property, water

supplies, water systems, wells, piping, soil, vegetation, and other property because of the City's

AFFF, and its toxic PFAS components, released by the City into the environment at and near

LSE.

122.    As a result of Defendants' tortious conduct and the resulting contamination,

Plaintiffs and Class Members consumed PFAS contaminated household water which has caused

them to suffer an increased risk of illness, disease, disease processes because of such exposure.

To appropriately address such increased risk, Plaintiffs and Class Members require an award of

the cost of a program for medical monitoring for early detection and/or identification of such

illness, disease, or disease processes. Early detection of such illness, disease, and/or disease

processes will benefit Plaintiffs and Class Members.

123.    Plaintiffs and Class Members were significantly exposed to PFAS, increasing

their risk of illness, disease, and disease process, and causing the medical necessity of diagnostic

testing for the early detection of latent or misidentified illness, disease, and disease process, and

the resulting pecuniary loss of the costs of that testing, proximately caused by Defendants'

tortious conduct.

124.    Accordingly, Plaintiffs and Class Members seek compensation for the costs of

medical monitoring for early detection of illness, disease, and disease processes beneficial to

Plaintiffs and Class Members, and the costs of administration of that testing, or in the alternative

the award of reasonable and necessary costs of the establishment of a court-supervised program

of medical monitoring and diagnostic testing through equitable and/or injunctive relief.

**PLAINTIFFS AND CLASS MEMBERS HAVE SUFFERED PAST AND PRESENT
INJURY FOR WHICH THEY NEED DIAGNOSTIC TESTING DUE TO THEIR**

27

**INCREASED RISK OF DISEASE CAUSED BY EXPOSURE TO TOXIC PFAS
COMPONENTS CONTAINED IN AFFF USED BY THE CITY**

125.    Plaintiffs and Class Members have suffered past, present, and future injury as a result of their significant exposure to and consumption of household water contaminated with toxic PFAS components contained in AFFF used and released by the City at and around LSE. Plaintiffs and Class Members have ingested PFAS-contaminated water which was absorbed into their tissue and bloodstream. Because of their past significant exposure, Plaintiffs and Class Members have suffered past, present, and future increased risk of illness, disease, or disease processes, including cancer, making it presently medically necessary that they undergo diagnostic testing for early detection of illness, disease, and disease processes.

126.    PFAS are toxic and carcinogenic to humans. For decades, the manufacturers' memoranda, outside scientific literature, and regulatory agencies have made clear that exposure to PFAS causes various adverse health effects, including cancer.

127.    Studies have made clear that exposure to PFAS bioaccumulates and results in toxic invasion and persistence in human tissue and bloodstreams, including Plaintiffs' and Class Members' tissue and bloodstreams, and altering the structure of their bodies.

128.    Moreover, based on available scientific literature, exposure to toxic PFAS components places Plaintiffs and Class Members at increased risk of developing several serious illnesses, diseases, and disease processes.

129.    With early detection and identification, Plaintiffs and Class Members can seek early treatment and prepare their lives accordingly for the toxic consequences of significant exposure to toxic PFAS components.

130.    The City did not seek or obtain permission or consent from Plaintiffs or Class Members before engaging in tortious acts and/or omissions that caused, allowed, and/or resulted

28

in their significant exposure to the known toxic PFAS components contained in the City's release
of AFFF from and around LSE.

131.    As a proximate result of the City's tortious conduct, Plaintiffs and Class Members
have been, are presently, and will continue to be at a significantly increased risk of illness,
disease, or disease processes, including cancer. Plaintiffs' and Class Members increased risk of
illness, disease, and disease process makes it reasonably medically necessary to incur, both now
and in the future, the cost of diagnostic testing for the early detection of illness, disease, and
disease processes arising from their exposure to toxic PFAS components.

132.    Plaintiffs and Class Members have legally protected interests in not being
exposed to harmful levels of toxic PFAS components contained in AFFF which significantly
increase their risk of illness, disease, and disease processes. Plaintiffs and Class Members also
have legally protected interests in avoiding the past, present, and future medical need for
expensive diagnostic tests and the pecuniary injury of the costs of medically necessary diagnostic
tests.

133.    Plaintiffs and Class Members have been exposed to toxic PFAS components of
AFFF. As a result of the City's releases of AFFF, and its toxic PFAS components, Plaintiffs' and
Class Members' household water supply has been contaminated. Plaintiffs and Class Members
relied on that water supply and therefore ingested and absorbed toxic PFAS components into
their bloodstream and tissue. As a direct and proximate result of these releases, Plaintiffs and
Class Members have suffered the past, present, and future need for diagnostic testing for the
early detection and identification of PFAS-related illness, disease, and disease process.

134.    Defendants' tortious conduct constitutes an invasion of legally protected interests
of Plaintiffs and Class Members and has injured Plaintiffs and Class Members. Plaintiffs and

Class Members would not have suffered an increased risk of illness, disease, or disease process nor the consequent ongoing pecuniary injury of the need to incur costs of medically necessary diagnostic testing to identify the presence of illness, disease, or disease processes arising from their exposure to toxic PFAS components, but for the past and ongoing exposure they suffer as a proximate result of Defendants' tortious conduct.

135.    But for Defendants' tortious conduct, Plaintiffs and Class Members would not have suffered significant exposure to toxic PFAS components from Defendants' AFFF. Such exposure has made it medically reasonably necessary for Plaintiffs and Class Members to engage in diagnostic testing to monitor and identify latent illness, disease, and disease processes. Diagnostic testing necessary to monitor and identify such illness, disease, and disease processes requires Plaintiffs and Class Members to suffer pecuniary injury of the cost of such diagnostic testing.

136.    Medical monitoring is recognized as beneficial for early detection where there is an increased risk of disease from exposure to hazardous substances.[10] The purpose of medical monitoring in the form of diagnostic testing is the benefit of early identification of latent or unrecognized illness, disease, or disease process. Early detection is beneficial because treatment can then be given to reduce the impacts of the toxic exposure.[11] Medical monitoring is widely accepted as prudent response to toxic exposure.[12]

---

[10] ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA, 60 F.R. 38841, July 28, 1995.
[11] *Id.*
[12] See www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf (last accessed Sept. 19, 2023); Dept. of Enviro. Health, *Ferland Medical Monitoring Program*, UNIVERSITY OF CINCINNATI COLLEGE OF MEDICINE, https://med.uc.edu/eh/research/projects/fcc/fmmp-history (last accessed Sept. 19, 2023); Enviro Health & Safety, *Pesticide Users Medical Monitoring Program*, UNIVERSITY OF FLORIDA (revised Jan. 21, 2014) www.ehs.ufl.edu/pgorams/ih/pesticide/ (last accessed Sept. 19, 2023);

137.    Diagnostic testing procedures exist that make early detection the toxic effects of PFAS possible. These programs will benefit Plaintiffs and Class Members because they will allow for the early detection of latent or unrecognized disease associated with PFAS. Identifying cancer and other serious illness, disease, and disease process early allows greater treatment options, improves patient prognoses, and avoids more invasive, risky, and expensive medical interventions after an inaccurate diagnosis. Plaintiffs' and Class Members' overall medical outlook depends on early diagnosis: the sooner a person is checked, the better the ultimate outcome.[13]

138.    Periodic diagnostic testing for the early detection of illness, disease, and disease process conforms to standards of medical care and are reasonably necessary to ensure that illness, disease, and disease processes can be identified early and treated aggressively. Effective diagnostic tests exist for reliable early detection. Early detection combined with effective treatment significantly decrease the severity of the illness, disease, disease process, or injury.[14] The present value of costs of such tests is calculable, and Plaintiffs and Class Members will prove such costs at trial.

139.    For example, Plaintiffs and Class Members exposed to PFAS from AFFF have been significantly exposed to PFOA, a known toxic substance.

140.    Plaintiffs' and Class Members' exposure to PFOA has caused them to suffer an increased risk of thyroid disease. Monitoring procedures exist for early detection of thyroid disease through thyroid screening, including blood samples to measure thyroid stimulating

World trade Center Health Program, *About the Program*, CENTERS FOR 379.
[13] www.cancer.org/content/dam/CRC/PDF/Public/8671.00.pdf (last accessed Sept. 19, 2023).
[14] DISEASE CONTROL AND PREVENTION, www.cdc.gov/wtc/about.html (last updated Dec. 15, 2017).

hormone, and monitoring strategies to assess the progression of the disease.

141.    Plaintiffs' and Class Members' exposure to PFOA has caused them to suffer an increased risk of testicular cancer. Monitoring procedures exist for early detection of testicular cancer through use of testicular examinations and ultrasound procedures.

142.    Plaintiffs' and Class Members' exposure to PFOA has caused them to suffer an increased risk of kidney cancer. Monitoring procedures exist for early detection of kidney cancer through use of screening for its presence by medical questionnaires, abdominal examinations, and urine tests. Additional testing mechanisms including MRIs, CT scans, and ultrasounds allow for detection of disease symptoms.

143.    These monitoring procedures are different in type, timing, frequency and/or scope from what would normally be recommended in the absence of exposure to toxic PFAS components. The general unexposed population does not receive procedures of the type, timing, frequency, and/or scope necessitated by significant exposure to toxic PFAS components from AFFF because these tests are designed to detect specific illnesses, diseases, and disease processes known to be associated with exposure to toxic PFAS components.

144.    Because of their exposure to toxic PFAS components contained in AFFF, Plaintiffs and Class Members require medically necessary diagnostic testing to diagnose the warnings signs of PFAS-related illness, disease, and/or disease processes. Early detection of illness, disease, and disease processes caused by exposure to toxic PFAS components allows Plaintiffs and Class Members more treatment options, reduces treatment costs, and increases their chances of an improved outcome.  The progression from subcellular and/or other latent alterations in the structure and function of Plaintiffs' and Class Members' bodies to the outward manifestation of serious disease can be delayed for years. If such illness, disease, or disease

32

process is permitted to develop until it becomes obvious, patent, or recognized, Plaintiffs and

Class Members will have lost valuable time and disease progress and will likely suffer more

severe or long-term health effects and require more costly interventions.

145.    As a direct and proximate result of Defendants' tortious conduct Plaintiffs and

Class Members suffered significant exposure to toxic PFAS components of Defendants' AFFF

which significantly increased their risk of illness, disease, and disease, process. Therefore,

Plaintiffs' and Class Members' have in the past and presently need to incur the cost diagnostic

testing to monitor and identify latent illness, disease, and disease process.

## DEFINITION OF THE CLASS

146.    This action is brought by the Plaintiffs individually on their own behalf and as

representatives of the class defined below seek to certify and maintain this matter as a class

action pursuant to Wisconsin Statute §803.08(1) and (2)(c), (2)(b), or alternatively (6) (FRCP

23(b)(1), (b)(2), (b)(3), or alternatively (c)(4)).

147.    The Members of the Medical Monitoring class are defined as:

All persons who on or after January 1, 1970, occupied residential real property with
private wells within the Class Area which obtained household water from those wells,
and who:

> during the period from birth up to their 20th birthday, consumed household water
> containing 20 ppt of PFOA or greater or were breastfed by a mother who
> consumed household water containing 20 ppt of PFOA or greater during
> breastfeeding at their residential real property for a cumulate time period of one
> year or more, or who

> during the period from their 20th birthday or after, consumed household water at
> the residential real property they occupied for the number of days of consumption
> at specified PFOA water concentrations in Appendix A, or greater,

> and who

> served a notice of circumstances of claim and itemized claim on the City pursuant
> to §893.80(1d) (a) and (b), Stats.

33

148.    The Private Well Class Geographic Area is defined as the Town of Campbell, Wisconsin.

149.    Excluded from the Class are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel or their immediate family members; and (d) any State or any of its agencies.

**COMPLIANCE WITH WIS. STAT. §803.08 (FED. R. CIV. P. 23) REQUIREMENTS**

150.    Plaintiffs and Class Members bring this action pursuant to Wisconsin Statute §803.08(1) and (2)(c) (FRCP 23(a) and (b)(3)), on behalf of themselves and all other persons similarly situated for the direct, proximate, and foreseeable injuries caused by exposure to and ingestion of toxic PFAS components in household water contaminated by AFFF released at LSE and designed, manufactured, sold, and/or distributed by Defendants. The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Wisconsin Statute §803.08(1) and (2)(c) (Fed. R. Civ. P. 23 (a) and (b)(3)).

(I)     Numerosity

151.    The members of the Class are so numerous that joinder of all members is impracticable.  The number of owned and/or formerly owned properties is in the hundreds, and there are nearly one thousand members of the Class who have been exposed to toxic PFAS components released on or around LSE as described herein and who have served a claim upon the City, pursuant to §893.80(1d) (a) and (b), Stats.  Members can be easily identified as those individuals who have served claims upon the City, pursuant to §893.80(1d) (a) and (b), Stats.

(II)    Typicality

152.    The Representative Plaintiffs' claims are typical of the claims of the members of

the Classes since the members of the Classes consumed household water from private wells in

the Class Area at levels and frequencies defined above resulting in injury to all members of the

Classes. Plaintiffs and Class Members were and are similarly or identically harmed and their

claims arise from the same actions and/or inactions of the City. Plaintiffs and all Class Members

were exposed to toxic PFAS components from AFFF used by the City. As a result, each Plaintiff

and Class Member reasonably requires present and future medical monitoring to ensure early

detection of illness, disease, and disease process caused by exposure to PFAS.

(III)    Adequate Representation

153.    The Representative Plaintiffs will fairly and adequately protect the interests of

members of the Class Members and have retained counsel competent and experienced in tort,

class action and environmental litigation.

154.    The Representative Plaintiffs and their counsel are committed, and have the

resources, to vigorously prosecute this action on behalf of the Class.

155.    There are no material conflicts between the claims and the Representative

Plaintiffs and Class Members that would make class certification inappropriate.

156.    Neither Plaintiffs nor their counsel have interests adverse to any of the other

Plaintiffs or the other members of the Class.

(IV)    Predominance of Common Questions

157.    Plaintiffs and Class Members bring this action under Wis. Stat. §803.08(2)(c)

(FRCP 23(b)(3)) because numerous questions of law and fact common to Class Members

predominate over any question affecting only individual members. The answers to these

35

common questions will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

(a)      the type or kinds of toxic PFAS components from AFFF that have been and are being released from LSE;

(b)      the activities of the City that have resulted in the contamination of the household water supplies and other properties of the Plaintiffs and the Class Members by AFFF and its toxic PFAS components;

(c)      the nature and toxicity of the toxic PFAS components from AFFF released from LSE;

(d)      whether the property rights of Plaintiffs and the Class Member property owners have been and will continue to be diminished by the interference with property rights caused by the contamination as a result of the City's release of AFFF containing toxic PFAS components;

(e)      whether the Plaintiffs and Class Member property owners have suffered the need for and the cost of mitigation at and remediation of their properties;

(f)      whether the City owed a duty to Plaintiffs and Class Members;

(g)      whether the City breached a duty owed to Plaintiffs and Class Members;

(h)      whether the PFAS contamination of Plaintiffs' properties by the City's actions was reasonably foreseeable;

(i)      whether the City knew or should have known that their use of AFFF, and its toxic PFAS components, was unreasonably dangerous;

(j)      Whether the City knew of should have known that their AFFF containing toxic PFAS components were and are persistent, stable, mobile, and likely to contaminate household water;

36

(k)     whether the City was negligent in its use of AFFF, and its toxic PFAS components, at LSE;

(l)     whether the City failed to sufficiently warn residents of French Island of the potential for harm that resulted from its use of AFFF containing toxic PFAS components;

(m)     whether the City's actions constitute a trespass;

(n)     whether the City's actions constitute a nuisance;

(o)     whether the City became aware of the health and environmental harm caused by toxic PFAS components in the AFFF used by the City and failed to warn Plaintiffs and Class Members of the same;

(p)     whether Plaintiffs and Class Members have been significantly exposed to toxic PFAS components as a result of the City's use of AFFF.

(V)     <u>Superiority</u>

158.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

159.     The City has acted on grounds generally applicable to the Class, thereby making appropriate final legal and/or equitable relief with respect to the Class as a whole.

160.     Furthermore, the expense and burden of individual litigation outweighs the individual injuries suffered by individual Class Members, making it impossible for members of the Class to individually redress the wrongs done to them.

161.     Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

162.     There will be no difficulty in the management of this action as a class action.

## WIS. STAT. §803.08(2)(b) (FRCP 23(b)(2)) EQUITABLE RELIEF REQUIREMENTS

163.    In addition to, or in the alternative to, the above, Plaintiffs and Class Members

bring this class action under Wis. Stat. §803.08(2)(b) (FRCP 23(b)(2)) because Defendants have

acted or refused to act on grounds that apply generally to the Class Members as a whole, such

that final equitable relief is appropriate respecting the class as a whole.

164.    Defendants have acted and/or refused to act on grounds applicable generally to

the Class Members as a whole. The City's use of AFFF, and its toxic PFAS components, resulted

in releases into the environment, including at and around LSE, which they knew or should have

known would occur through the ordinary and intended uses of the AFFF.

165.    The City's decision to not make known for years the presence and migration of

PFAS in the groundwater on French Island and the toxic characteristics of PFAS components

contained in AFFF when they knew or should have known that PFAS are highly toxic, mobile,

and persistent in the environment resulted in the continued release and migration of the product

into Plaintiffs and Class Members' household water supplies. Accordingly, the City's acts and/or

refusal to act have similarly affected Plaintiffs and Class Members as a whole because it has

resulted in contamination of their household water supplies, exposure to and/or ingestion of

PFAS, and an increased risk of illness, disease, and disease process.

166.    Equitable relief sought by Plaintiffs and Class Members includes, but is not

limited to, the implementation and funding of a medical monitoring program for the Plaintiffs

and Class Members sufficient to monitor the health of the Plaintiffs and Class Members to

ensure the beneficial early detection of illness, disease, and disease process caused by exposure

to toxic PFAS components of AFFF. Court supervised programs such as medical monitoring are

paradigmatic of equitable relief intended to mitigate or prevent the risk of illness, disease, and

disease process caused by the City's acts and omissions. Therefore, Plaintiffs and Class Members seek establishment of a common program of diagnostic testing because of common conduct that will benefit the class as a whole.

167.    Plaintiffs and Class Members present a cohesive class because each of the members have been significantly exposed to toxic PFAS components contained in AFFF which presents an increased risk of illness, disease, and disease process to the class as a whole. Further, medical monitoring and diagnosis programs exist to which benefit Plaintiffs and Class Members because they will not be forced to allow latent illness, disease, or disease process to become manifest.

## WIS. STAT. §803.08(6) (FRCP 23(C)(4)) REQUIREMENTS

168.    In the alternative, this case is properly maintained as a class action with respect to the following issues under §803.08(6) (FRCP 23(C)(4)):

(a) The liability of the City and others under Plaintiffs' and Class Members' claims for relief resulting from of the City's releases AFFF containing toxic PFAS components designed, manufactured, sold, and/or distributed by Defendants;

(b) The liability of the City for Plaintiffs' and Class Members' exposure to toxic PFAS components, including under legal theories of nuisance, negligence, failure to warn, and battery;

(c) Whether Plaintiffs and Class Members have been exposed to toxic PFAS components contained in AFFF;

(d) The nature and types of toxic PFAS components which are contained in AFFF used by the City;

(e) The nature and toxicity of the PFAS components contained in AFFF used by the City;

(f) Whether the City knew or should have known of the nature and toxicity of the PFAS components in AFFF they used;

(g) Whether the City negligent and/or tortious conduct caused Plaintiffs' and Class Members' significant exposure to toxic PFAS components contained in AFFF;

(h) Whether the City knew or should have known that use of AFFF containing toxic PFAS components would contaminate Plaintiffs' and Class Members' properties and household water supplies;

(i) Whether, as a result of exposure to toxic PFAS components contained in AFFF, Plaintiffs and Class Members suffer an increased risk of contracting serious latent illness, disease, and disease process;

(j) Whether exposure to toxic PFAS components contained in AFFF caused Plaintiffs' and Class Members' medical need for diagnostic testing for early detection of illness, disease, and disease process;

(k) Whether diagnostic testing exist for the beneficial early detection of illness, disease, or disease process caused by PFAS;

(l) Whether the reasonably medically necessary diagnostic testing is different from medical procedures normally recommended in the absence of exposure; and

(m) Whether Plaintiffs' and Class Members' exposure to toxic PFAS components from AFFF has made a program of medical monitoring, including diagnostic testing for early detection of illness, disease, or disease process, reasonably necessary.

169.    The above referenced issues would materially advance the present claims for relief as required pursuant to §803.08(6) (FRCP 23(c)(4)). Therefore, the above referenced issues are of the type for which certification pursuant §803.08(6) (FRCP 23(c)(4)) is appropriate.

**CLAIM I**
**NEGLIGENCE AND NEGLIGENCE *PER SE***

As for their first claim for relief, the Plaintiffs and Class Members allege:

170.    Re-allege and incorporate by reference as if fully set forth herein all of the preceding allegations.

171.    At all times relevant hereto, the City owed Plaintiffs and Class Members a duty to act with reasonable care, so as to avoid contamination of the environment and of household drinking water supplies with known hazardous substances and to avoid harm to those who would foreseeably consume water and be exposed to the toxic PFAS components used by the City and to not jeopardize Plaintiffs' and Class Members' health and welfare and cause them to suffer a loss of the use of their private drinking water wells and/or to incur water replacement costs, and/or medical diagnostic expenses.

172.    The City further knew or should have known that it was unsafe, unreasonably dangerous, and/or hazardous to use AFFF with toxic PFAS components because it was highly probable that toxic PFAS components would migrate into the environment surrounding LSE, and contaminate the groundwater used to supply household water.

173.    Given the likelihood that French Island would become contaminated with toxic PFAS components resulting from the City's half-century of use of AFFF on and around LSE, the City had a duty to investigate the extent to which the toxic PFAS components in AFFF released on French Island were likely to migrate through surface water and/or groundwater and contaminate Plaintiffs' and Class Members' properties and household water supplies.

174.    The City knew or should have known that the use of AFFF containing toxic PFAS components was hazardous to human health and the environment.

175.    Knowing of the dangerous and hazardous properties of AFFF, the City had a duty to warn of the presence of PFAS in groundwater and the hazards of ingesting water containing toxic PFAS components.

176.    Upon information and belief, the City breached its duty of care by creating and/or failing to mitigate the creation of water pollution (both surface and groundwater). The City also breached its duty of care to the Plaintiffs and Class Members by failing to adequately supervise and train employees. The City has failed to properly train and supervise employees and contractors performing ultra-hazardous activities while working at the LSE facility; failed to exercise reasonable care to contain toxic PFAS once the City knew it had polluted a large area in and about Plaintiffs' and Class Members' property and knew the harmful PFAS which permeated groundwater, and/or soil in and about of the area of Plaintiffs' and Class Members' property, created a substantial health risk to Plaintiffs and Class Members and others; failed to timely warn the residents of the neighborhood, including the Plaintiffs and Class Members, of the presence and migration of PFAS in groundwater on French Island and the health hazards associated with the PFAS, and failed to take appropriate measures to prevent the spread of PFAS; failed to notify authorities in a timely fashion of the full gravity and nature of the ground and surface water contamination; failed to prevent or mitigate health hazards and damage to the value of the property in and about the neighborhood, including the real property occupied by Plaintiffs and Class Members; failed to timely and effectively remediate the spills of AFFF; and failed to comply with applicable industry standards, internal safety rules, and state and federal safety laws, rules, regulations and standards.

177.    The acts of the City constitute negligence and negligence *per se* as a result of the City's violations of state, federal and local rules, regulations, statutes and ordinances. The City's

negligent acts are a substantial factor in causing Plaintiffs and Class Members to suffer injuries, as set forth herein, including without limitation, past and ongoing increased risk of illness, disease, and disease processes, actual or imminent damage to their residential water supplies, and discomfort and harm to property occupied by them, persons, and livestock or pet(s). The negligently created environmental harms have been a substantial factor in creating personal fear, worry, anxiety, marital discord, inconvenience, discomfort, and harm, and further forcing Plaintiffs and Class Members to incur expenses for monitoring the supply and control of water, and expert consultants' fees, all to Plaintiffs' and Class Members' damage.

178.    Upon information and belief, as a direct and proximate result of the foregoing acts and/or failures to act of the City, the Plaintiffs and Class Members have been damaged as a result of significant exposure to toxic PFAS components resulting in past and ongoing increased risk of illness, disease, and disease processes and a loss of enjoyment of properties occupied by them due to the nuisances and water pollution set forth above, personal fear, anxiety, inconvenience and discomfort, and/or an unreasonable risk of future disease or illness, and other and further injuries as the evidence may establish.

179.    The multiple injuries that the Plaintiffs and Class Members have sustained are permanent in nature, thereby causing them to suffer ongoing increased risk of illness, disease, and disease processes, loss of use of their private drinking water well, and personal fear, anxiety, inconvenience and discomfort, and/or an unreasonable risk of disease or illness in the future.

180.    As direct and proximate result of the aforementioned negligent conduct of the City, Plaintiffs and Class Members have been damaged due to the loss of society, companionship and services of each other.

43

## CLAIM II
## PUBLIC NUISANCE

As and for their second claim for relief, the Plaintiffs and Class Members allege:

181.    Re-allege and incorporate by reference as if fully set forth herein all of the preceding allegations.

182.    Plaintiffs and Class Members are members of the public and the community surrounding LSE. Plaintiffs and Class Members use and benefit from public waterways and groundwater in the vicinity of LSE.

183.    The conduct and activities of the City in its use of AFFF on and in the vicinity of LSE constitute a public nuisance in that such activities substantially or unduly interfere with the use of public places, public waterways, and the groundwater in common use by the Plaintiffs and Class Members.

184.    The activities of the City further substantially or unduly interferes with the activities of the entire community, and are specially injurious to the health and offensive to the senses of Plaintiffs and Class Members and specially interferes with and disturbs their comfortable enjoyment of their life and of their property, which is different in kind from the injury suffered by the general public.

185.    As a direct and proximate result of the public nuisance created and perpetuated by City's tortious conduct, Plaintiffs and Class Members have suffered, and will in the future continue to suffer, interference with their use and enjoyment of public places, including public waterways and groundwater, and their own private property, diminution in property value, present and future remediation costs, personal fear, anxiety, inconvenience and discomfort, and/or an unreasonable risk of future disease or illness, and other and further injuries as the evidence may establish.

44

186.    Unless the public nuisance caused by the tortious conduct of the City is abated, the use and enjoyment of public spaces, including public waterways and groundwater, and Plaintiffs' and Class Members' property and rights of enjoyment therein will be progressively diminished in value and their health will be further jeopardized.

187.    As a direct and proximate result of the public nuisance caused by the City as alleged herein, Plaintiffs and Class Members were injured and suffered injuries as described herein.

## CLAIM III
## PRIVATE NUISANCE

As and for their third claim for relief, the Plaintiffs and Class Members allege:

188.    Re-allege and incorporate by reference as if fully set forth herein all of the preceding allegations.

189.    Plaintiffs and Class Members have proprietary interests in certain real and personal property in the areas adversely affected by City's Airport operations. Plaintiffs also have the right to the exclusive use and quiet enjoyment of their property.

190.    The tortious conduct of the City constitutes a private nuisance in that it has caused substantial injury and significant harm to, invasion and/or interference with, the comfortable enjoyment and private use by Plaintiffs and Class Members of their private real and personal property, and their rights to use in the customary manner their property and residences without being exposed to the dangers of water pollution.

191.    The interference and invasion by the City exposing the Plaintiffs and Class Members to the aforementioned dangers is substantially offensive and intolerable.

192.    The aforementioned conduct by the City causing said interference and invasion has occurred because said City has been and continues to be negligent and has failed to exercise

45

ordinary care to prevent its activities from causing significant harm to the Plaintiffs' and Class

Members' rights and interests in the private use and enjoyment of property occupied by them.

193.    Unless the nuisance is abated, property occupied by Plaintiffs and Class Members

and their right to enjoy such property will be progressively further interfered with and

diminished in value and their health will be further jeopardized.

194.    As a direct and proximate result of the nuisance created by the City, Plaintiffs and

Class Members have suffered, and continue to suffer, substantial interference with their normal

use and enjoyment of property occupied by them and rights incidental thereto, present and future

remediation costs, severe emotional distress, personal fear, anxiety, inconvenience and

discomfort, and/or an unreasonable risk of future disease or illness, and other and further injuries

as the evidence may establish.

## CLAIM IV
## TRESPASS

As and for their fourth claim for relief, the Plaintiffs and Class Members allege:

195.    Re-allege and incorporate by reference as if fully set forth herein all of the

preceding allegations.

196.    At all times relevant hereto, landowner and/or lessee Plaintiffs and Class

Members were in lawful possession of certain real and personal property in the areas affected by

the City's use of AFFF on and around LSE, as set forth above.

197.    The City intentionally and/or recklessly committed the wrongful act of trespass by

causing hazardous PFAS chemicals and/or other hazardous substances or toxins to invade the

real and personal property of the landowner and/or lessee Plaintiffs and Class Members through

the groundwater, surface water, and/or soil.

198.   Upon information and belief, the Plaintiffs' and Class Members' well water was and remains contaminated with unacceptable levels of PFAS due to the trespassory actions of the City.

199.   Plaintiffs and Class Members in no way consented or provided permission to the City's conduct which inevitably resulted in AFFF containing toxic PFAS components entry onto and contamination of Plaintiffs' and Class Members' residential real property. As a result, Plaintiffs and Class Members were exposed to and consumed toxic PFAS components which have invaded their bodies, bloodstream, and tissue. These trespasses occurred in the past, are occurring, and will continue to occur.

200.   As a direct and proximate result of the City's acts of trespass, landowner and lessee Plaintiffs and Class Members were injured, and continue to be injured, in that they suffered damage to their real and/or personal property and to their health and wellbeing, including hazardous PFAS chemicals leaving the LSE property or otherwise being deposited on the ground by City employees which was, and is, deposited on Plaintiffs' and Class Members' property, along with contamination of groundwater and/or surface water moving from LSE and other areas where the City used AFFF onto Plaintiffs' and Class Members' property, and such actions constitute a trespass on property owned or lawfully possessed by Plaintiffs and Class Members, and has been and still is a substantial factor in causing past and future injuries to the Plaintiffs and Class Members.

## CLAIM V
## BATTERY

As and for their fifth claim for relief, the Plaintiffs and Class Members allege:

201.   Re-allege and incorporate by reference as if fully set forth herein all of the preceding allegations.

47

202.    The City's intentional tortious conduct has caused, is causing, and will continue to cause harmful and offensive contact with Plaintiffs and Class Members.

203.    As a result of the City's tortious conduct, releases of toxic PFAS components in AFFF into ground and household water supplies have foreseeably migrated into the Class Area and exposed Plaintiffs and Class Members to household water which contained toxic PFAS components. Toxic PFAS components consumed by Plaintiffs and Class Members were absorbed into their bloodstream and body tissues and continue to alter their bodies' structures which constitutes harmful and offensive contact.

204.    The City's intentional tortious conduct caused bodily harm to the Plaintiffs and Class Members in a way not justified by Plaintiffs' and Class Members' apparent wishes or by any privilege, and the contact was in fact harmful and/or against Plaintiffs' and Class Members will.

205.    The City's intentional tortious conduct included:

(a)     the use and spilling of AFFF containing toxic PFAS components to be used, as intended, in a manner that would inevitably cause contamination of household water which would be consumed by persons using that household water including Plaintiffs and Class Members.

(b)     concealment by the City of its knowledge that AFFF and its toxic PFAS components had entered the groundwater on French Island and had migrated through the groundwater, and concealment by the City of its knowledge that AFFF and its toxic PFAS components' chemical characteristics made them substantially certain to harm Plaintiffs and Class Members who were exposed to, and contacted by, PFAS unknowingly, without permission, and against their will.

48

206.    The City lacked any privilege or consent to cause harmful and offensive contact with Plaintiffs and Class Members by the toxic PFAS components of AFFF they knew had been released into the environment and contaminated water supplies, and exposed Plaintiffs and Class Members to PFAS contaminated water supplies without their consent.

207.    The City's contact was harmful because it altered the structure, form, and/or physical condition of Plaintiffs' and Class Members' bodies and increased their risk of suffering illness, disease, or disease process.

208.    The City's contact with Plaintiffs and Class Members was offensive in that contact with PFAS-contaminated water is offensive to a person with reasonable sense of personal dignity. Such contact would offend the ordinary person and not one unduly sensitive as to his personal dignity. The City's contact was therefore unwarranted by the social usages prevalent at the time and place at which it was inflicted.

209.    The City's actions constituted constructive intent to injury; their intent to injure may be inferred from their conduct which was likely to threaten the safety of others and was so reckless or manifestly indifferent to the consequences Defendants were practically certain their acts and omissions would cause harmful and offensive contact.

210.    As set forth above, The City's conduct was intentional, malicious, and in complete disregard of Plaintiffs' and Class Members' rights.

211.    As a result of the City's tortious conduct, Plaintiffs and Class Members suffered bodily harm in the form of alteration of the physical condition, structure, and/or function of their bodies, resulting from their significant exposure to PFAS-contaminated water supplies.

212.    As a direct result of the City's conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, private wells, and other property,

49

by the toxic PFAS components of the AFFF, the Plaintiffs and Class Members have incurred and will incur the injuries identified herein.

## CLAIM VI
### INJUNCTIVE AND/OR DECLARATORY RELIEF

As and for their sixth claim for relief, the Plaintiffs and Class Members allege:

213. Re-allege and incorporate by reference as if fully set forth herein all of the preceding allegations.

214. As a direct and proximate result of the above-described conduct of the City, and the injuries described herein, Plaintiffs and Class Members intend to seek the following equitable relief:

A. That a judicial determination and declaration be made of the rights of the Plaintiffs and Class Members and the responsibilities of the City with regard to the injuries caused by said the City to the fullest extent allowed by law;

B. That the City be required, to the fullest extent allowed by law, to restore Plaintiffs' and Class Members' property and LSE property to the condition it was in prior to being contaminated by PFAS and/or other contaminants.

## DAMAGES SOUGHT BY THE CLASS

215. Plaintiffs and Class Members incorporate by reference the allegations contained in the proceeding paragraphs as if they were fully set forth herein.

216. Plaintiffs and Class Members seek an award of the costs of a program of medically necessary diagnostic testing for the early identification and detection of illness, disease, and/or disease process associated with significant exposure to chemical components of AFFF containing toxic PFAS components.

50

WHEREFORE, Plaintiffs and the Class Members demand judgment as follows:

A.      For an order certifying the Class under Wisconsin Statute §803.08(1) and (2)(c) (FRCP 23(a) and (b)(3)) appointing Plaintiffs as Class Representatives and the undersigned and Class Counsel;

B.      Alternatively, for an order certifying the Class under Wisconsin Statute §803.08(1) and (2)(b) (FRCP 23(a) and (b)(2));

C.      Alternatively, for an order certifying the Class issues under Wisconsin Statute §803.08(1) and (6) (FRCP 23(a) and (c)(4));

D.      Compensatory damages against the Defendants in a sum to be determined by verdict, together with interest on said sum;

E.      For their costs and disbursements;

F.      Equitable and injunctive relief specified herein; and

G.      Such other and further relief as this Court deems just and equitable.

**FITZPATRICK, SKEMP & BUTLER, LLC**
**Attorneys for Plaintiffs and Class Members**

Dated:  October 12, 2023.          *Electronically signed by Timothy S. Jacobson*
Timothy S. Jacobson, WI Bar No. 1018162
1123 Riders Club Rd
Onalaska, WI  54650
608.784.4370
tim@fitzpatrickskemp.com

**SINGLETON SCHREIBER, LLC**
**Attorneys for Plaintiffs and Class Members**

Dated:  October 12, 2023.          *Electronically signed by Kevin S. Hannon*
Kevin S. Hannon, WI Bar No. 1034348
Joseph A. Welsh (*Pending Pro Hac Vice*)
1641 Downing Street
Denver, CO  80218
720.704.6028
khannon@singletonschreiber.com

51

Paul Starita (*Pending Pro Hac Vice*)
SINGLETON SCHREIBER, LLC
591 Camino de la Reina #1025
San Diego, CA 92108
720.704.6028
pstarita@singletonschreiber.com

**PLAINTIFFS HEREBY DEMAND TRIAL BY A JURY OF TWELVE (12).**

**APPENDIX A**

Exposure Characteristics Expected to Cause Significant Increases in Peak or Cumulative Serum PFOA Concentrations and Health Risks

| Water PFOA Concentration (ppt) | Cumulative Days of Consumption |
|---|---|
| 20 | 2650 |
| 21 | 2263 |
| 22 | 1994 |
| 23 | 1791 |
| 24 | 1631 |
| 25 | 1501 |
| 26 | 1392 |
| 27 | 1299 |
| 28 | 1218 |
| 29 | 1148 |
| 30 | 1086 |
| 31 | 1031 |
| 32 | 981 |
| 33 | 936 |
| 34 | 895 |
| 35 | 858 |
| 36 | 824 |
| 37 | 792 |
| 38 | 763 |
| 39 | 736 |
| 40 | 711 |
| 41 | 688 |
| 42 | 666 |
| 43 | 646 |
| 44 | 626 |
| 45 | 608 |

| 46 | 591 |
|----|-----|
| 47 | 575 |
| 48 | 560 |
| 49 | 546 |
| 50 | 532 |
| 51 | 519 |
| 52 | 506 |
| 53 | 495 |
| 54 | 483 |
| 55 | 473 |
| 56 | 462 |
| 57 | 453 |
| 58 | 443 |
| 59 | 434 |
| 60 | 425 |
| 61 | 417 |
| 62 | 409 |
| 63 | 401 |
| 64 | 394 |
| 65 | 387 |
| 66 | 380 |
| 67 | 373 |
| 68 | 367 |
| 69 | 361 |
| 70 | 355 |